UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | DR:24-CR-00404-AM |
| | § | |
| | § | |
| | § | |
| JEREMY SCOTT ALLRED | § | |

DEFENDANT'S MOTION TO DISMISS

TO THE HONORABLE ALIA MOSES, CHIEF JUDGE FOR THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS:

## I.      INTRODUCTION

Defendant Jeremy Scott Allred moves, pursuant to Federal Rule of Criminal Procedure
12(b)(3)(B), to dismiss the Indictment, which charges him with possession of a firearm by a person
who has been convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. §
922(g)(9).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that
the Second Amendment right to bear arms is not a second-class right. 597 U.S. 1, 70 (2022). The
Court rejected decades of "judicial deference to legislative interest balancing" in the form of
means-end scrutiny in Second Amendment jurisprudence. *Id.* at 26. Instead, *Bruen* instructs courts
to ask only: (1) whether the Second Amendment's plain text covers the conduct, and (2) whether
the Government can show the law is consistent with historical firearm regulations. *Id.* at 17. As
the Fifth Circuit subsequently explained, *Bruen* "fundamentally changed" Second Amendment
analysis and rendered prior precedent obsolete. *See United States v. Rahimi*, 61 F.4th 443, 450-51

(5th Cir. 2023).[1] Under this new framework, the Fifth Circuit has struck down two criminal laws since *Bruen*, §§ 922(g)(8) and (g)(3). *See id.*; *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023).

Section 922(g)(9) violates the Second Amendment. The statute impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including misdemeanants, and the Government cannot meet its burden to show § 922(g)(9) is consistent with the Nation's historical tradition of firearm regulation because there is no relevant historical evidence of categorically people who have been convicted of a misdemeanor crime of domestic violence. At the very least, there is no evidence of disarming people like Mr. Allred, rendering the statute unconstitutional as applied to him. *See Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc); *see also United States v. Bullock*, __ F. Supp. 3d __, No. 3:18-cr-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023).

Additionally, Mr. Allred preserves for further review the question of whether § 922(g)(9) violates the Commerce Clause.

In support of his motion, Mr. Allred shows the following:

## II.     BACKGROUND

On February 28, 2024, a grand jury returned an Indictment, charging Mr. Allred with knowingly possessing a firearm after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). ECF Doc. No. 8. Mr. Allred was convicted on February 7, 2005, of Assault of a Family Member pursuant to Texas Penal Code § 22.01(a), which

---

[1] The Supreme Court granted the petition for certiorari in *Rahimi* on June 30, 2023. *United States v. Rahimi, Zackey,* No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023). The Supreme Court did not vacate the Fifth Circuit's decision in *Rahimi*, and *Rahimi* is still binding precedent. *See DeMoss v. Crain*, 636 F.3d 145, 151 n. 1 (5th Cir. 2011) ("Despite the grant of *certiorari*, we continue to follow *Sossamon* as binding precedent."). The grant of certiorari does not override the Fifth Circuit's precedent.

states a person commits the offense if he "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse."

### III.     LEGAL STANDARD

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record); *see also*, *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *See Flores*, 404 F.3d at 325.

### IV.     SECOND AMENDMENT ARGUMENT

Section 922(g)(9) criminalizes firearm possession for any person who has been convicted of a misdemeanor crime of domestic violence. Under the new framework announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(9) violates the Second Amendment both facially and as applied to Mr. Allred.

#### A.  *Bruen* "fundamentally changed" the analytical framework for analyzing Second Amendment challenges.

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court

held that the Second Amendment codified an individual right to possess and carry weapons, the core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right").

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id*. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id.* Otherwise, courts proceeded to the second step to determine whether to apply strict or intermediate scrutiny. *Id*. That framework has now been abrogated by the Supreme Court. *See Bruen*, 597 U.S. at 19.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims. The Court rejected the second step of the two-step inquiry adopted by this Court and others because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* The Supreme Court reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. The Supreme Court elaborated that, under the new framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 17. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm

regulation." *Id*. If the Government cannot make that showing, then the regulation is unconstitutional. *Id*.

The Fifth Circuit has since explained that *Bruen* "fundamentally changed" Second Amendment challenges and rendered prior precedent in the area "obsolete." *Rahimi*, 61 F.4th at 450-51. Under *Bruen* and *Rahimi*, courts must apply the *Bruen* textual and historical framework to all Second Amendment challenges and cannot obviate that requirement by relying on pre-*Bruen* caselaw. The Fifth Circuit reiterated this framework in *Daniels*, 77 F.4th at 341.

**B.   Section 922(g)(9) facially violates the Second Amendment.**

Section 922(g)(9) violates the Second Amendment on its face under the *Bruen* framework. The *Bruen* Court drew no distinction between as-applied and facial challenges under the Second Amendment; in fact, neither term appears anywhere in the majority opinion. But *Bruen* itself established the standard for facial challenges: "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 61 F.4th at 453. Facial challenges consider only whether the text of the challenged statute is inconsistent with the Second Amendment's text and historical understanding. *Id*.; *see also Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual."). Section 922(g)(9) is facially unconstitutional because its text is inconsistent with the Second Amendment's text and historical understanding.

Courts generally consider the constitutionality of a statute as applied before determining its facial constitutionality, to avoid striking down the statute in its entirety. *See Hollis v. Lynch*, 121 F. Supp. 3d 617, 629-30 (N.D. Tex. 2015) (citing *United States v. Vuitch*, 402 U.S. 62, 70 (1971), *Renne v. Geary*, 501 U.S. 312, 324 (1991)). For the purposes of analytical clarity, however, Mr. Allred addresses his facial challenge first in this brief.

**1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(9).**

Section 922(g)(9) permanently disqualifies all people who have been convicted of a misdemeanor for a crime of domestic violence from exercising the fundamental right to possess firearms for self-defense. Under the plain text of the Second Amendment, it is presumptively unconstitutional. *See Bruen*, 597 U.S. at 21-24

        a.   <u>Firearm possession is covered by the Second Amendment's plain text</u>.

The Second Amendment protects "the right of the people to keep and bear Arms …." U.S. Const. amend. II. The plain text, "keep and bear arms," means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. The Court in *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 597 U.S. at 10. Section 922(g)(9) is a complete ban on all firearm possession, with no limitations on type or use. It, therefore, impacts the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also generally Bruen*, 597 U.S. 1.[2]

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. *Id*. at 17; *United States v. Bullock*, __ F. Supp. 3d __, No. 3:18-cr-165, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) ("*Bruen* step one requires us to look at the 'conduct' being regulated, not the status of the person performing the conduct."). Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

---

[2] Legislative history suggests that Congress, in passing the modern version of § 922(g), acknowledged that it would infringe an individual's right to bear arms, but wrongly concluded that the Second Amendment does not confer an individual right to bear arms. *See, e.g.*, S. Rep. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169; *see also Heller*, 554 U.S. at 628.

b.  Mr. Allred is included in "the people" protected by the Second Amendment.

The Second Amendment covers all citizens by conferring the right "to keep and bear arms" on "the people." U.S. Const. amend. II. The plain text does not limit who is included in "the people." *Id*. The text simply says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has confirmed that "the people" includes "all Americans." *See Heller*, 554 U.S. at 5819 (the phrase "unambiguously refers to all members of the political community, not an unspecified subset"); *see also United States v. Daniels*, 77 F.4th at 343 (quoting *Heller*).[3] Whether a category of person can be disarmed is therefore a question of historical tradition—and falls under the second *Bruen* step.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—i.e., those in a militia. 554 U.S. at 579–81, 592–600. The Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81.

*Heller* explained that, like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. Categorically excluding people convicted of a misdemeanor crime of domestic violence from the plain text of the Second Amendment would, therefore, endanger their basic protections under the First and Fourth Amendment. *See Range*, 69 F.4th at 101-02. Otherwise, it would run afoul of *Bruen*'s directive that the Second Amendment is

---

[3] *Cf.* 3 Joseph Story, Commentaries on the Constitution of the United States § 1890 (1833) ("The right of the *citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. State*, 1 Ga. 243, 250 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree.").

"not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70; *cf. United States v. Coombes*, 629 F. Supp. 3d 1149, 1155-56 (N.D. Okla. 2022) (declining to exclude felons from the scope of the Second Amendment).

One sitting Justice—who joined the majority in *Bruen*—has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the purely textual question of the existence of the right. In *Kanter v. Barr*, then-Judge Barrett reasoned that, under *Heller*, the word "people" refers to "all Americans"—that even those who can be lawfully restricted, are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. 1. The "question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.*; *cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (interpreting *Heller* to say that felons and others who could be disarmed are still part of "the people" protected by the Constitution). Thus, a person's status as a person convicted of a misdemeanor crime of domestic violence is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Kanter*, 919 F.3d at 451–52.

The Fifth Circuit has now twice rejected the Government's attempts to limit "the people" protected by the Second Amendment to only "law-abiding, responsible citizens." *See Rahimi*, 61 F.4th at 451–53; *Daniels*, 77 F.4th 342-43. The court reiterated *Heller*'s conclusion that the right "belongs to all Americans." *See Daniels*, 77 F.4th 342-43. And both *Daniels* and *Rahimi* endorsed Justice Barrett's reasoning that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Rahimi*, 61 F.4th at 451–52 (explaining the Government's argument is wrong and runs "headlong into *Heller* and *Bruen*, which we read to espouse" the

Justice Barrett approach from *Kanter*); *Daniels*, 77 F.4th at 344 n.2 (noting its reasoning accords with *Range* and the *Kanter* dissent). As *Rahimi* explained, the Government's imposition of this gloss onto the scope of the right "turns the typical way of conceptualizing constitutional rights on its head," because a person could be "readily divested" of the right—"in one day and out the next." 61 F.4th at 452–53 (citing *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)). It further noted that the "Government's proffered interpretation of 'law-abiding' admits to no true limiting principle." *Id*. at 453. Rather, "as a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorially excluded from the privilege." *Daniels*, 77 F.4th at 343 (citing *Rahimi*, 61 F.4th at 453); *see also Bullock*, 2023 WL 4232309, at *20-21 (finding felons are not excluded from the Second Amendment at step one).[4]

The Third Circuit has specifically held that a person's status is not properly considered at this stage—holding that felons are protected by the Second Amendment, repudiating in even clearer terms the Government's attempt to limit the right to "law-abiding, responsible" citizens." *See Range*, 69 F.4th at 101-03.[5]

---

[4] The Fifth Circuit acknowledged the Supreme Court's use of the term "law-abiding, responsible citizens," but explained "we cannot read too much into the Supreme Court's chosen epithet." *Daniels*, 77 F.4th at 343. The court noted the language meant to "exclude from the discussion the mentally ill and felons, people who were historically stripped of their Second Amendment rights." *Id.* (citing *Rahimi*, 61 F.4th at 452). But any such "exclusion" would be as part of *Bruen*'s second step, which examines the historical power to restrict firearms. *See id*. at 343 ("as a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorically excluded from the privilege"); *see also United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023) (reading *Rahimi* to require consideration of a person's status at the historical, second step of *Bruen*); *Melendrez-Machado*, 2023 WL 4003508, at *3–4 (same); *United States v. McDaniel*, No. 22-cr-176, ECF No. 53 at 7 (E.D. Wis. May 3, 2023) ("In other words, the 'law-abiding' language was shorthand for the historical analysis, not a (significant) limitation on who initially falls within the amendment's scope."). Indeed, the *Daniels* court discusses the historical "stripping" of rights, not the absence of rights. 2023 WL 5091317, at *4. Both longstanding prohibitions and groups historically stripped of their rights involve a *historical* analysis. Any alternative reading would directly contradict *Rahimi* and *Daniels*'s reiteration of *Heller*, endorsement of Justice Barrett's approach, and rejection of the "law-abiding" gloss proffered by the Government. *See id*. at 341-42; *Rahimi*, 61 F.4th at 451–53.

[5] Since *Bruen*, several district courts have likewise recognized that a person's status is not properly considered at this stage of the *Bruen* framework. *See, e.g., Bullock*, 2023 WL 4232309, at *20; *United States v. Quiroz*, 629 F. Supp. 3d 511, 516-17 (W.D. Tex. 2022) (finding § 922(n) unconstitutional); *United States v. Coombes*, 629 F. Supp. 3d 1149,

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, the categorical ban on an individual's possession of a firearm based on their status as a person convicted of a misdemeanor crime of domestic violence is presumptively unconstitutional under the plain text of the Second Amendment. Whether a category of person can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

### 2. The Government cannot show that § 922(g)(9) is "consistent with the Nation's historical tradition of firearm regulation."

Because the plain text of the Second Amendment covers § 922(g)(9), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Government cannot meet that burden.

The *Bruen* framework requires the Government to establish that the challenged law "is consistent with this Nation's historical tradition of firearm regulation." *Id. Daniels* clarified that *Bruen* established two different approaches for this historical analysis, depending on whether the challenged law addresses "unprecedented societal concerns" or a "general societal problem that has persisted since the 18th century." *Daniels*, 77 F.4th at 342-44. Under this framework, the Government must meet a higher burden and show that § 922(g)(9) is "distinctly similar" to founding-era laws, not just "relevantly similar" because domestic violence is a "general societal problem that has persisted since the 18th century."

*Bruen* set out several metrics by which the sufficiency of the historical precedent should be analyzed: (1) the historical regulations' temporal proximity to the founding era, (2) the breadth

1155-56 (N.D. Okla. 2022) (upholding § 922(g)(1), but finding the conduct was presumptively protected by the Second Amendment); *United States v. Forbis*, 2023 WL 5971142, at *3 (N.D. Okla. Aug. 17, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant with prior convictions for "recidivist DUI" and "simple possession of controlled substances).

.

of historical regulations, and (3) the similarity of the historical regulation to the challenged restriction. *Bruen*, 597 U.S. at 34-35.

For temporal proximity, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id.* at 34 (quoting *Heller*, 554 U.S. at 634–35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id.*[6] Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. The Court expressed skepticism about reliance on laws passed long after the passage of the particular Constitutional Amendment and explained that, "to the extent later history contradicts what the text says, the text controls." *Id.* at 36.

Regarding breadth, the Government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Id.* at 39. In other words, the founding-era historical evidence must show a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic." *Id*. at 36 (cleaned up). The Government cannot "simply posit that the regulation promotes an important interest." *Id*. Nor can it rely on "outlier" historical restrictions. *Id*. at 30, 70. Indeed, the *Bruen* Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id*. at 46 (emphasis in original). Moreover, it is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id*. at 25 n.6.

---

[6] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. But Reconstruction-era laws are of limited value when addressing a *federal* law, which implicates the Second Amendment, not the Fourteenth. *See Daniels*, 2023 WL 5091317, at *8-9; *see also Bruen*, 597 U.S. at 37–38; *see also id*. at 82-83we m (Barrett, J., concurring).

Lastly, the Government must present founding-era historical examples comparable to the challenged regulation. *Bruen* described two approaches for how similar historical evidence must be to a challenged regulation. *See Daniels*, 77 F4th. At 341-42. For a regulation that "addresses a general societal problem that has persisted since the 18th century," a "straightforward historical inquiry" applies. *Bruen*, 597 U.S. at 26. For that straightforward inquiry, the "lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. A distinctly similar regulation, as illustrated by *Bruen*'s historical analysis, means that the historical regulation must be meaningfully the same.[7] *Id.* at 65-66. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 27. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id*. at 28. Whether a historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id*. at 29. But this "nuanced approach" only applies to "modern regulations that were unimaginable at the founding." *Id*. at 28. The Fifth Circuit recently explained that the two tests seemed "aimed at interpreting historical silence." *Daniels*, 77 F.4th at 344. If the Founders encountered the same problem sought to be addressed by a modern regulation, the lack of a distinctly similar law signals disapproval. *Id.* But if the problem did not exist at that time, the Founders' silence says little about their approval of such a regulation. *Id*.

---

[7] The Court found only one statute sufficiently analogous to the New York public-carry restriction to be "distinctly similar"—a Texas statute effectively identical to the New York restriction. *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). The Texas statute forbade carrying a pistol unless the person had reasonable grounds to fear an attack, and the New York regulation required the person to show a special need for defense before issuing a public-carry license.

a. <u>The Government cannot produce "distinctly similar" laws that prove a tradition of categorically disarming people convicted of misdemeanor crimes of violence.</u>

The Government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming all people convicted of misdemeanor crimes of domestic violence—i.e., "distinctly similar" regulations. Section 922(g)(9) does not address an "unprecedented societal concern" nor is it a "modern regulation that [was] unimaginable at the founding." *See Bruen*, 597 U.S. at 28. Domestic violence has existed since long before the founding. Therefore, like in *Bruen* and *Heller*, the court should apply the "straightforward approach," and the Government bears the burden to show founding-era laws that are "distinctly similar" to § 922(g)(9), not just "relevantly similar."

***The history of categorical firearms restrictions
does not support disarming people convicted of a misdemeanor crime of domestic violence.***

Reviewing historical examples of categorical restrictions on firearm possession—i.e., wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis of temporal proximity to the founding era, similarity to the challenged restriction, and breadth. While there is some limited historical evidence of disarming certain specific categories of people, much was expressly rejected by the Second Amendment, and none supports finding § 922(g)(9) constitutional.

Historical analyses of firearms rights and regulations generally begin with pre-founding English common law, though the Supreme Court cautions against placing undue emphasis on English laws, particularly laws that long pre-date this Nation's founding. *See Bruen*, 597 U.S. at 39-41. As early as the 15th and 16th century, English law targeted potentially disloyal communities, including Catholics and the Welsh, for disarmament. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L.

13

Rev. 249, 257–65 (2020) [Greenlee]. In the Restoration period of the mid-17th century, the Stuart monarchs more aggressively disarmed political and religious dissidents. *See Heller*, 554 U.S. at 592–93. For example, the Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom;" the 1671 Game Act, involved disarmament of those who did not own property, particularly in Protestant regions; and forfeiture of "armour" could be ordered for those who went "armed to terrify the King's subjects." *Id*.; *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). Laws like the Militia Act of 1662 were generally understood as pretextual and overreaching statutes used to disarm political opponents, and were expressly rejected in the United States by the Second Amendment. *See Rahimi*, 61 F.4th at 456; *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 401–02 (2019).

Indeed, the Declaration of Rights—a precursor to the Second Amendment—explicitly rejected abuses like the Militia Act and ensured that Protestants would not be disarmed. *See Heller*, 554 U.S. at 593; Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 Wm. & Mary Bill Rts. J. 1037, 1058 (2009); Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 114–18 (1994). Following the Glorious Revolution in 1688, a Convention of elected representatives drafted the Declaration of Rights, which included that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *See Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021) [Ristroph]. Almost immediately thereafter, Parliament began disarming Catholics viewed as potential dissidents. *See id*. Through the 18th century, England targeted "papists and other disaffected persons, who disown his Majesty's government," for disarmament, to quell

14

concerns over potential rebellions and insurrections. *See* Greenlee at 260–61. The most discernable English tradition prior to American independence was the disarmament of religious dissidents perceived as threatening to the crown. *See id*. at 257–61.

In the American colonies during the 17th and 18th centuries, categorical disarmament was largely reserved for Native Americans, indentured servants, enslaved persons, black freedmen, and others outside of the "body politic." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 156–58 (2007) [hereinafter Churchill]. Scholars have likewise recognized a trend of disarming individuals who voluntarily excluded themselves from that "body politic" by refusing to swear allegiance, first to the crown, and later to the American Revolution and newly established states and commonwealths. *Id*. at 157–61. As in England, the colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Greenlee at 263.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal colonists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554 U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id*. at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself. *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. Greenlee at 268–70. For example, some religious dissidents in the Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id*.

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," or on targeted disfavored groups like "tramps." *Id*. at 269–70. But these prohibitions, like earlier laws, did not disarm people convicted of misdemeanor crimes of domestic violence as a class. After a full survey of printed session laws on gun regulation, history professor Robert H. Churchill concluded: "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142, 143 n.11.

A brief review of English and early American historical categorical firearms restrictions evidences a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive regulations, rather than an endorsement of such categorical restrictions. But, insofar as the United States incorporated any tradition of categorical exclusion, it assuredly did not include the targeted disarmament of felons until the 20th century.

In *Rahimi*, the Fifth Circuit, in holding §922(g)(8) unconstitutional, considered the historical tradition of firearm regulation. While the Fifth Circuit was considering the constitutionality of disarming people subject to domestic violence restraining orders, the Court

also noted that restricting people convicted of misdemeanor crimes of domestic violence did not fit within the Nation's historical tradition of firearm regulation. *Rahimi*, 61 F.4th at 460 n. 11 (citing David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."); Keateon G. Hille, The *Second Amendment: From* Miller *to* Chovan, *and Why the* Marzzarella *Framework is the Best Shot Courts Have*, 50 Gonz. L. Rev. 377, 392 (2015) (acknowledging that the "prohibition on firearms possession by domestic violence misdemeanants is not longstanding" and advocating for a means-ends test); Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 741 (2012) ("If longstanding tradition is the key common characteristic of the items on the *Heller* list, modern legal innovations like the ban on guns for domestic violence misdemeanants, however much they may reduce risks and benefit society, do not qualify.")).

### The absence of "distinctly similar" founding-era regulations disarming all felons is evidence of § 922(g)(9)'s unconstitutionality.

Turning to the *Bruen* framework, the absence of "distinctly similar" founding-era laws evidences 922(g)(9)'s unconstitutionality. *See Bruen*, 597 U.S. at 26. There are no founding era laws "distinctly similar" to § 922(g)(9). The modern statutes that dispossess all people convicted of misdemeanor crimes of domestic violence. There is simply no tradition--from 1791 or 1866--of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders. Greenlee, 61 St. Louis U. L.J. at 244.

Reliance on the passage of § 922 itself to support its own historical tradition is logically circular and ignores *Bruen*'s skepticism of 20th century historical evidence. *See Bruen*, 597 U.S. at 36-37, 66 n.28.

Any finding that there are distinctly similar historical examples prohibiting domestic violence misdemeanants is irreconcilable with the framework laid out in *Bruen*. The Supreme Court expressly rejected the use of means-end scrutiny. *Bruen*, 597 U.S. at 19-22. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts have cautioned against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).[8] Indeed, in referring to "longstanding prohibitions," the *Heller* Court never suggested that these prohibitions would be exempt from historical scrutiny. To the contrary, *Heller* explained "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. *Bruen* acknowledged the same. *See* 597 U.S. at 21 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment"). Since *Bruen*, the en banc Third Circuit has rejected reliance on this "longstanding prohibition" language to uphold § 922(g)(1), noting that the statute, passed in the 20th century, "falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." *Range*, 69 F.4th at 104.

*Bruen* requires the Government to provide "distinctly similar" historical examples from the founding era to prove consistency with the Nation's traditions. *See generally Bruen*, 597 U.S. 1. It did not create an exception to its framework for people convicted of domestic violence misdemeanors. Courts are simply not permitted to disregard the framework laid out in *Bruen*,

---

[8] *See also* Winkler at 1567; Nicholas J. Johnson, et al, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 855 (3d ed. 2022); Lund at 1356-57.

based on dicta from *Heller*.[9] If categorical prohibitions for domestic violence misdemeanants are indeed "longstanding," and satisfy the newly articulated framework in *Bruen*, the Government would be able to identify specific "distinctly similar" historical examples of such a tradition. But it cannot.

The absence of founding-era laws specifically disarming people convicted of misdemeanor crimes of domestic violence forecloses the Government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(9) and is relevant evidence of the statute's unconstitutionality.

### *Misdemeanants were, in fact, likely <u>required</u> to keep firearms at the founding, further undermining any historical basis for § 922(g)(9).*

Not only were people convicted of misdemeanor crimes of domestic violence *permitted* to keep firearms at the founding; they were almost certainly *required* to keep them.

The lack of historical firearm restrictions on misdemeanants is not surprising. At the founding, the *right* to bear arms was also deeply connected to the historical *duty* to bear arms. *See* Malcolm at 138–40; Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 219–22 (3d ed. 2022) [Johnson]. Indeed, the Second Amendment codified an individual right, but the prefatory clause clarifies that the purpose of that right was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. This duty to bear arms was reflected in federal and state laws *requiring* most citizens to keep firearms as part of militia

---

[9] Other courts have gone further, finding no need to engage in the *Bruen* analysis at all, because they believe themselves to be bound by the "longstanding prohibitions" dicta from *Heller*. *See, e.g., United States v. Minter*, __ F. Supp. 3d __, No. 3:22-CR-135, 2022 WL 10662252, at *3–6 (M.D. Pa. Oct. 18, 2022). The *Heller* dicta is not binding for that purpose and, indeed, there is no binding precedent from this Court that § 922(g)(1) is constitutional under the new *Bruen* framework. The Fifth Circuit has also rejected reliance on pre-*Bruen* circuit caselaw because *Bruen* "fundamentally changed" Second Amendment jurisprudence. *See Rahimi*, 61 F.4th at 450-51; *see also Range*, 69 F. 4th at 99-100.

service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792).[10] These laws "exempted" certain classes of people, but not people with criminal convictions. *Id.* § 2, 1 Stat. 272; *cf.* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) [Barondes] (finding no evidence that those with criminal convictions were excluded from militia duties or firearm ownership). The colonies generally required even indentured servants—often convicted criminals—to be armed for militia service. *See* Johnson 185, 191–92. Countless colonial laws similarly required citizens to keep and carry firearms to and from church, as part of patrol duties, to aid against attacks by Native Americans, or otherwise to defend themselves and their community. *See id.* at 189–91; Stephen P. Halbrook, THE RIGHT TO BEAR ARMS 131–35, 191–98 (2021).

It follows that, while "the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. Aug. 25, 2022). Disarming misdemeanants would have made little sense to the Founders because it would have effectively relieved them of a civic duty. Despite passing myriad other gun restrictions—early versions of gun registrations, safe storage laws, restrictions on types of firearms, and disarmament of Native Americans, enslaved persons, and religious minorities—the founders never proposed barring misdemeanants from receiving guns or disarming them. *See* Adam Winkler, GUNFIGHT 113–18,

---

[10] Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Second Militia Act, § 1. The Act further required that "every citizen so enrolled … shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and other related items like ammunition. *Id.* Similar contemporaneous state militia statutes also did not to exempt felons or those under indictment. *See, e.g.*, Thomas Herty, DIGEST OF THE LAWS OF MARYLAND 367–73 (1799); Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917); Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792); Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73 (J. Mitchell & H. Flanders comm'rs 1904); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 350 (1802); *cf. United States v. Miller*, 307 U.S. 174, 178–82 (1939) (discussing militia laws); Johnson 177–89 (in depth discussion about arms requirements for militia service in each colony).

286–87 (2013) (detailing Revolutionary era gun laws and noting absence of restrictions like those from the 20th century).

### The Government cannot show historical regulations that are "relevantly similar" to § 922(g)(9)

Even if the Court finds the applicable standard is "relevantly similar," the Government cannot even meet the less burdensome standard to show "relevantly similar" firearms restrictions to § 922(g)(9) from the founding era.

Even prior to *Bruen*, some courts relied on a purported tradition of disarming "unvirtuous" citizens to support modern felon disarmament laws. *See Medina*, 913 F.3d at 159 (collecting cases). This "virtuous citizen" theory, however, lacks historical support. *See* Greenlee at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id.*; *see also* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245 (2021); *Folajtar v. Att'y Gen. United States of America*, 980 F.3d 897, 915–16 (3d Cir. 2020) (Bibas, J., dissenting) (referring to the academic sources for the "virtuous citizen theory" as "like the layers of a matryoshka doll, each nested layer successively larger with little at the core. Once we take them apart, none proves that felons' lack of virtue excludes them from the Second Amendment.").

Rather, as described above, historical categorical disarmament was generally limited to disempowered minority communities—e.g., enslaved persons, freed black Americans, and Native Americans—and those who evidenced disloyalty to the government. *See id.* at 261–65; Churchill at 156–61. Many of these types of categorical restrictions were rejected by the Second Amendment and courts have cautioned against citing to such "historical travesties to support taking someone's Second Amendment rights today." *See United States v. Hicks*, 649 F. Supp. 3d 357, 364 (W.D. Tex. Jan. 9, 2023). But even those of arguable historical relevance do not "impose a comparable

21

burden on the right" and are not "comparably justified" to § 922(g)(9)'s categorical disarmament of people convicted of misdemeanor crimes of domestic violence. *See Bruen*, 597 U.S. at 29-30 (explaining metrics of comparing "relevantly similar" analogues).

Indeed, insofar as there is any historical basis for disarming "unvirtuous" or "dangerous" citizens, the Fifth Circuit has rejected reliance on much of it under *Bruen*. *See Rahimi*, 61 F.4th at 456-59; *Daniels*, 77 F.4th at 353-55. The Fifth Circuit found that many historical examples proffered by the Government were not only insufficiently analogous to § 922(g)(8) and § 922(g)(3), but historically dubious more broadly speaking. Most importantly, the court rejected efforts to compare felon disarmament to a generalized tradition of disarming the "dangerous," explaining that to "remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of 'dangerousness'" *Id*. at *14; *cf. Bruen*, 597 U.S. 31, 59, 70 (criticizing defining the category "far too broadly"); *Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous ... to delineate the scope of the Second Amendment").

The Fifth Circuit has also rejected reliance on much of the particular underlying historical evidence. *Rahimi* dismissed politically motivated English disarmament laws as inconsistent with the Second Amendment. 61 F.4th at 456. It questioned reliance on laws disarming enslaved persons, Native Americans, and disloyal people, which "may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether[.]" *Id*. at 457. It foreclosed reliance on alternative proposals during ratifications conventions to impose dangerous persons limitations on the Second Amendment, because they were not included in the Second Amendment's text. *Id*. And it reasoned that laws related to "going armed offensively" curbed terroristic conduct, not individuals, and that it is "doubtful these 'going armed' laws are

reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms." *Id*. at 457-59. *Daniels*, similarly, explained that laws disarming certain "dangerous" groups are not similar to § 922(g)(3), because they sought to quell possible threats to the government by rebellion, not generalized public harm. 77 F.4th at 354-55. For all these reasons, reliance on such dubious historical support for § 922(g)(9) likewise fails.

The Third Circuit has likewise rejected reliance on much of this type of historical evidence as analogues for § 922(g)(1), at least as applied to certain offenders. *Range*, 69 F.th at 103-06. With respect to certain historical laws purportedly disarming so-called "dangerous" people, the court explained that the Government had failed to successfully analogize them to the appellant, and that lumping such groups together was "far too broad" an analogy. *Id*. at 104. *Range,* like *Daniels*, confirms that the Government cannot simply group together disparate laws and characterize them as a broad tradition; *Bruen* requires comparison of a challenged law to actual historical laws. While the court limited its holding to Range's as applied challenge, the reasoning would extend to § 922(g)(1), and by extension § 922(g)(9), more broadly. Indeed, several of the dissenting opinions acknowledged the same. *See id*. at 116 (Shwartz, J., dissenting) ("the ruling is not cabined in any way and, in fact, rejects all historical support for disarming any felon"), at 131 (Krause, J., dissenting) ("the majority imposes a constitutional framework so standardless as to thwart the lawful application of 18 U.S.C § 922(g)(1) to *any* offender").

The frequently cited history of disarming "dangerous," "irresponsible," or "unvirtuous" people lacks historical support and is insufficient to demonstrate a historical tradition of regulations "relevantly similar" to § 922(g)(9), as required by *Bruen*.

*       *       *

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g)(9) that would illustrate a tradition of categorically disarming all people convicted of misdemeanor crimes of domestic violence. It cannot overcome the presumption that § 922(g)(9) violates the Second Amendment. *See Bruen*, 597 U.S. at 17. The statute is, therefore, facially unconstitutional.

### C. Section 922(g)(9) violates the Second Amendment as applied to Mr. Allred

Even if the Court determines that § 922(g)(9) is not facially unconstitutional, the statute violates the Second Amendment as applied to Mr. Allred. "As-applied challenges are the basic building blocks of constitutional adjudication[.]" *Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007). "Unlike a facial challenge, an as-applied challenge does not contend that a law is unconstitutional as written, but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Binderup v. Att'y General United States of America*, 836 F.3d 336, 345 (3d Cir. 2016) (citation omitted).

As discussed above, Mr. Allred's conduct—i.e., possession of a firearm and ammunition— is clearly protected by the plain text of the Second Amendment. *See Bruen*, 597 U.S. at 24. The burden is, thus, on the Government to show that disarming those with criminal records like his is consistent with the Nation's historical traditions. *See id*. There is no such tradition of barring all people convicted of domestic violence misdemeanors, let alone misdemeanants with records like Mr. Allred.

It is the Government's burden to show an historical tradition that supports disarming people like Mr. Allred. That is, even if the Court were to except that historical evidence supports disarming *some* felons, for Mr. Allred's as applied challenge, the Government must show it supports disarming Mr. Allred. *See generally Range*, 2023 WL 3833404; *see also Kanter*, 919 F.3d at 467 (Barrett, J., dissenting) (explaining that non-violent felons could bring as applied

challenges to § 922(g)(1)). Mr. Allred's predicate offense does not suggest that he is "dangerous." Rather, he has been convicted of assault of a family member. There is no historical evidence to support disarming felons at all, but certainly not those with criminal records like Mr. Allred. He is at least the type of offender recognized in *Range*, *Bullock*, or in the *Kanter* dissent, for whom there is no historical evidence of disarmament.

Because the Government cannot show that restricting firearms for those with criminal histories like Mr. Allred's is consistent with the Nation's historical traditions, § 922(g)(9) violates the Second Amendment as applied to Mr. Allred. *See Bruen*, 597 U.S. at 17.

## V.    COMMERCE CLAUSE ARGUMENT

Mr. Allred also argues that § 922(g)(9) violates the Commerce Clause.

The U.S. Constitution created a federal government of enumerated powers. *See* U.S. CONST. art. I, § 8. In *United States v. Lopez*, the Supreme Court invalidated the Gun-Free School Zones Act, holding that it exceeded Congress's authority under the Commerce Clause of the U.S. Constitution. 514 U.S. 549 (1995). Congress has the power "[t]o regulate commerce with foreign nations, and among the several states." U.S. CONST. art. I, § 8, cl. 3. The Court identified three categories of activities that Congress may regulate under its commerce power: "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce … Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Lopez*, 514 U.S. at 558–59 (internal citations omitted). The Court concluded that § 922(q) did not fall within the first two categories. Thus, if it survived constitutional scrutiny, "it must be under the third category as a regulation of activity that substantially affects interstate commerce." *Lopez*, 514 U.S. at 559.

The *Lopez* Court held that, under the third category, "[t]he proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. Section 922(q) failed the "substantial effect" test because Lopez's gun possession had nothing to do with commerce and was not a part of a greater scheme of commercial regulation. *Lopez*, 514 U.S. at 561–63; *see also United States v. Morrison*, 529 U.S. 598 (2000) (holding federal statute governing gender-motivated violence unconstitutional under Commerce Clause).

*Lopez* reflected the previous caution by the Supreme Court that the scope of the commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). In other words, the Commerce Clause does not create a federal police power.

The *Lopez* rationale—that possession of a weapon on school premises did not substantially affect interstate commerce to the extent necessary to allow the exercise of the federal commerce power—also applies to the federal statute prohibiting people convicted of misdemeanors of domestic violence from possessing firearms, 18 U.S.C. § 922(g)(9). To be constitutional, § 922(g)(9) must regulate activity that substantially affects interstate commerce. To meet this requirement, the statute must either involve commercial activity or include an interstate-commerce element that is sufficient to provide case-by-case proof of a substantial relation to commerce. Because § 922(g)(9) does not meet these requirements, it is unconstitutional.

Section 922(g)(9) makes it "unlawful for any person … who has been convicted in any court of a misdemeanor crime of domestic violence … to … possess in or affecting commerce[ ]

any firearm or ammunition[.]" Before *Lopez*, the Supreme Court analyzed a similarly worded predecessor statute, 18 U.S.C. § 1202(a), in *United States v. Bass*, 404 U.S. 336 (1971). The Court analyzed the text of the statute and held that the government was required to demonstrate some nexus between interstate commerce and the felon's possession of the weapon. 404 U.S. at 350. A few years later, in *Scarborough v. United States*, the Court held, as a matter of statutory interpretation, that "Congress intended no more than a minimal nexus requirement." 431 U.S. 563, 577 (1977). The *Scarborough* Court did not address the constitutionality of the minimal nexus requirement. *See id.* Rather, the Court held that proof that the possessed firearm previously traveled in interstate commerce is statutorily sufficient. *Id.* at 564, 578.

In *Lopez*, the Court suggested that the presence of a statutory nexus should be considered in determining whether a statute violates the Commerce Clause. *Lopez*, 514 U.S. at 561. Some courts have inferred from this suggestion that the mere presence of a jurisdictional element such as that in § 922(g)(9) will always save a statute from a Commerce Clause challenge. *See, e.g.*, *United States v. Santiago*, 238 F.3d 213, 216 (2d Cir. 2001); *United States v. Dorris*, 236 F.3d 582, 585 (10th Cir. 2000); *cf. United States v. Rawls*, 85 F.3d 240, 242 (5th Cir. 1996) (upholding § 922(g)(1), in part, on presence of jurisdictional element). The Supreme Court rejected this inference in *Jones v. United States*, 529 U.S. 848 (2000).

In *Jones*, the Court considered whether the federal arson statute, 18 U.S.C. § 844(i), which contains a jurisdictional element like that in § 922(g)(9), criminalizes the destruction of privately-owned property. 529 U.S. at 850. The Court construed the jurisdictional element in § 844(i) narrowly, to limit the statute's proscription to arson of property that is "currently used in commerce or in an activity affecting commerce." *Id.* at 859. In so ruling, the Court noted that a broader construction might render the statute unconstitutional under *Lopez*. *Id.* at 858.

Although *Jones*'s analysis turned on the definition of the word "use" in the arson statute—a term not present in the felon-in-possession statute—the case nonetheless has important implications for § 922(g)(9). Significantly, the Court in *Jones* indicated that the mere presence of a jurisdictional element will not save a statute from a Commerce Clause challenge. Instead, that element must be construed, if possible, to bring the statute within the limits set by the Constitution. *Id.* As the *Jones* Court recognized, those parameters were established in *Lopez*.

Thus, both *Lopez* and *Jones* cast substantial doubt on the constitutionality of the *Scarborough* statutory analysis, which requires no more than a showing of tangential connection to commerce. *See United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1995) (noting doubt). Acknowledging that previous cases were unclear on the point, the *Lopez* Court stated that the prohibited activity must substantially affect commerce "to be within Congress's power to regulate it under the Commerce Clause." *Lopez*, 514 U.S. at 559.

Criminalizing the possession of a firearm simply because that firearm at one time crossed state lines or entered commerce is an unconstitutional exercise of Congressional power. The interstate-commerce element does not save § 922(g)(9) because that element does not by itself satisfy the "substantial effect" test. Section § 922(g)(9) does not regulate the use of interstate commerce or its channels, or things in interstate commerce. Mere possession of a weapon has nothing to do with business or commerce; thus, it does not fall within the category of activities justifiably regulated by the federal government under the Commerce Clause. The statute is, therefore, unconstitutional.

Mr. Allred recognizes that the Fifth Circuit has rejected this argument facially. In *Rawls*, the Fifth Circuit held that "neither the holding in *Lopez* nor the reasons given therefor constitutionally invalidate § 922(g)(1)." 85 F.3d at 242. But the court commented that, "[i]f the

matter were res nova, one might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply" because the firearm had at some previous time traveled in interstate commerce. *Id.* at 242-43 (5th Cir. 1996) (Garwood, J., joined by Wiender & Garza, JJ., specially concurring); *see also United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013).

Acknowledging that this Court is bound by *Rawls* and *Alcantar*, Mr. Allred raises his argument that § 922(g)(9) is facially invalid because it exceeds Congress's power to preserve it for further review. To be constitutional, § 922(g)(9) must regulate activity that substantially affects interstate commerce. To meet this requirement, the statute must either involve commercial activity or include an interstate-commerce element that is sufficient to provide case-by-case proof of a substantial relation to commerce. Because § 922(g)(9) does not meet these requirements, it is unconstitutional.

Additionally, § 922(g)(9) is unconstitutional as applied to Mr. Allred's conduct. The Government's anticipated evidence will not show that Mr. Allred's alleged possession of the firearm had a substantial effect on commerce. Applying § 922(g)(9) to Mr. Allred's local conduct simply because the gun was made out of state and at some point crossed into Texas violates the Commerce Clause. Alternatively, the statutory language "in or affecting commerce" should not be construed to reach Mr. Allred's conduct. Because the evidence will not show conduct within the scope of the statute, or within Congress's power to prohibit, the Court should dismiss the Indictment.

## VI.   CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Allred requests that the Court dismiss the Indictment.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

_____

/s/   JAIME J. ZAMPIEROLLO
Assistant Federal Public Defender
Western District of Texas
2205 Veterans Blvd., Ste. A-2
Del Rio, Texas 78840
(830) 703-2040
(830) 703-2047 (FAX)
Bar Number: Texas 24106735

*Attorney for Defendant*

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of March, 2024, I electronically filed the foregoing

Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF system which will send

notification of such filing to the following:

Joshua Jerome Garland
Assistant U.S. Attorney
111 E Broadway St., Ste. A300
Del Rio, TX 78840

_____
        /s/   JAIME J. ZAMPIEROLLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | DR:24-CR-00404-AM |
| | § | |
| | § | |
| | § | |
| JEREMY SCOTT ALLRED | § | |

## **ORDER**

On this day, the Court considered Defendant's Motion to Dismiss the Indictment, and the

Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby:

ORDERED that the Indictment in this cause is DISMISSED.

SIGNED this ____ day of _____, 2024.

_____
**ALIA MOSES**
**CHIEF UNITED STATES DISTRICT JUDGE**